**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HENRY CALLAWAY,

                Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
TREASURY, *et al*.,

                Defendants.

Civil Action No. 04-1506 (RWR)

<u>**MEMORANDUM OPINION**</u>

      This matter is before the Court on defendants' Third Renewed Motion for Summary Judgment.[1] Having reviewed the motion, plaintiff's opposition and defendants' reply, the Court will grant the motion in part and deny it in part without prejudice.

**I.  BACKGROUND**

      Plaintiff brought this action pursuant to the Freedom of Information Act ("FOIA"), *see* 5 U.S.C. § 552, to challenge responses to requests he submitted to the Executive Office for United States Attorneys ("EOUSA") and the United States Customs Service ("Customs"), Compl. at 1, for "any and all criminal investigation and prosecution records pertaining to himself," *id.* at 2.[2]

---

[1]      Also before the Court is plaintiff's Motion Requesting the Status of the Pending Remanded Proceedings [Dkt. #96], and it will be granted.

[2]      "[P]rimary inspectoral responsibility at U.S. airports, seaports, and land border crossings" was transferred in 2003 from Customs, formerly a component of the United States Department of the Treasury, to U.S. Customs and Border Protection ("CBP"), a component of the Department of Homeland Security ("DHS"). Mem. of P. & A. in Supp. of Defs.' Mot. for

(continued...)

Defendants' first motion for summary judgment ("Defs.' MSJ") [Dkt. #22] was granted in part and denied in part without prejudice, Memorandum Opinion and Order, *Callaway v. U.S. Dep't of Treasury*, No. 04-1506 (D.D.C. Apr. 26, 2006), as was their renewed motion for summary judgment ("Defs.' Renewed MSJ") [Dkt. #46], Memorandum Opinion and Order, *Callaway v. U.S. Dep't of Treasury*, No. 04-1506 (D.D.C. Aug. 31, 2007). Defendants' second renewed motion for summary judgment ("Defs.' 2d Renewed MSJ") [Dkt. #61] was granted, Memorandum Opinion and Order, *Callaway v. U.S. Dep't of Treasury*, No. 04-1506 (D.D.C. Sept. 10, 2008), and plaintiff appealed. Notice of Appeal, *Callaway v. U.S. Dep't of Treasury*, No. 04-1506 (D.D.C. Oct. 29, 2008).

The United States Court of Appeals for the District of Columbia Circuit granted summary affirmance only with respect to the adequacy of the search for responsive records conducted by the EOUSA. Order, *Callaway v. U.S. Dep't of the Treasury*, No. 08-5480 (D.C. Cir. June 2, 2009) (per curiam). The D.C. Circuit remanded the case for resolution of four matters: (1) whether there remains a factual dispute with regard to the contents of audio tapes released by the EOUSA to plaintiff; (2) whether Customs conducted an adequate search for responsive records which may have been stored on microfiche; (3) whether any portion of the grand jury transcripts withheld by the EOUSA under Exemption 3 has entered the public domain; and (4) whether all

---

[2](...continued)
Summ. J. [Dkt. #22], First Fields Decl. ¶ 5. "[P]rimary investigative jurisdiction in the enforcement of immigration and customs laws" was transferred from Customs to U.S. Immigration and Customs Enforcement ("ICE"), another DHS component. *Id.* ¶¶ 2, 5. Defendants consider references in their supporting declarations to Customs interchangeable with references to ICE. Mem. of P. & A. in Supp. of Defs.' Second Renewed Mot. for Summ. J. [Dkt. #61], Marshall Decl. ¶ 4; Mem. of P. & A. in Supp. of Defs.' Third Renewed Mot. for Summ. J. [Dkt. #88], Pavlik-Keenan Decl. ¶ 2 n.1. As in previous memoranda, the Court will use the term "Customs."

reasonably segregable information has been released.  *See* Memorandum, *Callaway v. U.S. Dep't of the Treasury*, No. 08-5480 (D.C. Cir. June 2, 2009) (per curiam) ("Cir. Mem.") at 1-2. Defendants have filed a third renewed motion for summary judgment and supporting memorandum with exhibits ("Defs.' 3d Renewed MSJ") [Dkt. #88] to address the deficiencies identified by the D.C. Circuit.[3]  With the exception of segregability, this Court will address each matter in turn.

## II.   DISCUSSION

### A. *Audio Recordings N-113 and N-116*

According to the D.C. Circuit, "there appears to be a factual dispute with regard to the contents of the released audio tape recordings."  Cir. Mem. at 1.  Although the EOUSA asserted that "it had made no redactions to a CD-ROM . . . containing the recordings," plaintiff "present[s] evidence in the form of a verified complaint, attached exhibits, and an expert witness report, which suggests the recordings were redacted."  *Id.*  The D.C. Circuit remanded this matter in part for this Court to address the factual dispute.

Among other information, plaintiff requested from the EOUSA "the unredacted tape #N-113 from Case # 95-290-CR-T-21(E)," and the "unredacted tape of N#-116 [sic]."  Defs.' MSJ, First Kornmeier Decl., Ex. A (FOIA request dated May 20, 1998) at 2.  The case number plaintiff provided, No. 95-290-CR-T-21(E), was that of his criminal case in the United States District Court for the Middle District of Florida, Tampa Division, and the tape numbers referred

---

[3]      Subsequent references to "Defs.' 3d Renewed MSJ" are references to the supporting memorandum.

to recordings made by Customs during the investigation preceding the trial.[4]  *See* Compl., Ex. Z

(Contact Log) at 51 (page number designated by plaintiff).[5]  The tapes that apparently were

introduced as evidence at trial were located in "the criminal file of plaintiff" maintained by the

United States Attorney's Office for the Middle District of Florida ("USAO/MDFL"), and "only

one copy of each tape was found."  Defs.' Reply to Pl.'s Mot. in Opp'n of Defs.' Mot. for Summ.

J. ("Defs.' Reply") [Dkt. #27], Second Galban Decl. ¶ 6; *see* Compl., Ex. J (Letter from plaintiff

to Bonnie L. Gay, FOIA/PA Unit, EOUSA, dated September 14, 1998) at 1 (identifying tape

Nos. N-113 and N-116 as "government exhibits").  The trial exhibit tapes were copied, Defs.'

Reply, Second Galban Decl. ¶ 6, and forwarded to the EOUSA for processing.  Defs.' MSJ, First

Galban Decl. ¶¶ 4-5, 11.  The EOUSA released in full a CD-ROM containing four audio tapes,

including the trial exhibits bearing recordings from tape Nos. N-113 and N-116.  Defs.' MSJ,

First Kornmeier Decl. ¶ 18 & Ex. M (Letter to plaintiff from M.A. O'Rourke, Assistant Director,

Freedom of Information/Privacy Act Staff, EOUSA, dated April 4, 2005).

     Plaintiff objected to this response because the EOUSA "only released copies of the

redacted forms of the tapes . . . with contents of the conversations missing."  Concise Statement

of Genuine Issues [Dkt. #25] at 2.[6]  He requested "the entire tape recordings, not the <u>cut</u>

versions."  *Id.* (emphasis in original).  According to plaintiff, "the recordings were altered from

---

[4]    Audio cassette numbers N-113 and N-116 are recordings of telephone calls which occurred on October 19, 1995.  *See* Compl., Ex. Z at 50-51.  The first recorded a telephone conversation between Kenneth Sanders and Cecil McCloud, *id.* at 50, and the second recorded a telephone conversation between Kenneth Sanders and plaintiff, *id.* at 51.

[5]    Exhibits to the Complaint [Dkt. #1] were docketed separately [Dkt. #26].

[6]    Plaintiff submitted four separate documents, including a "Concise Statement of Genuine Issues," which the Clerk of Court docketed in one entry [Dkt. #25] as his opposition to defendants' first motion for summary judgment.

their original form," Compl. at 35, and defendants committed misconduct by withholding the unredacted recordings, *id.* at 36.   In support of his argument, plaintiff submitted the report of Roger W. Shuy, a Professor of Linguistics at Georgetown University, to establish that the tapes (and transcripts prepared therefrom) were flawed in that they did not contain the entire conversations.  *See generally* Compl., Ex. CC (Linguistic Analysis of Tape Recordings Involving Henry Callaway in the Case of USA v. Henry Callaway, Criminal Case No. 95-290-Cr-T-21(E), Middle District of Florida, Tampa Division, dated August 3, 2001).

The EOUSA's declarant reiterates that the agency released unredacted versions of the tapes it found in its files, and explains any alterations to the original recordings as follows:

> An investigative agency prepares physical evidence such as tapes for use at trial.  Whatever modifications an investigative agency may make to prepare the evidence for trial have already been made prior to giving it to an Assistant United States Attorney to present at trial. The tapes that the [USAO/MDFL] had in its possession were the ones that . . . [Customs] . . . had prepared for the criminal trial of [plaintiff].  Any modifications . . ., such as shortening of the tapes[,] had already been made prior to the criminal trial.   In response to [plaintiff's] FOIA request long after the criminal trial, EOUSA requested the tapes from the USAO/MDFL . . . [and the] EOUSA then simply released the tapes on April 4, 2005, in the exact form it had them making no redactions.

Defs.' 3d Renewed MSJ, Fourth Kornmeier Decl.  ¶ 5.[7]  Plaintiff considers it a "foregone conclusion that the audio tapes were infact [sic] altered and/or redacted during the time period of plaintiff's criminal investigation and prosecution," Mem. of P. & A. in Opp'n of Defs.' Third

---

[7]     Although the EOUSA typically redacts "based on privacy and wiretap statutes" audiotapes that are used as trial exhibits in a criminal case, Reply to Pl.'s Opp'n to Defs.' Third Renewed Mot. for Summ. J. ("Reply") [Dkt. #95], Fifth Kornmeier Decl. ¶ 6, it did not do so here because "the information on the tapes had entered the public domain as exhibits at [plaintiff's] trial."  *Id.*, Fifth Kornmeier Decl. ¶ 7.

Renewed Mot. for Summ. J. ("Pl.'s Opp'n") [Dkt. #93] at 5, and he is well aware that any

redaction or alteration of the tapes "pre-dates the release of the audio tapes by EOUSA," *id.* at

20; *see* Defs.' 3d Renewed MSJ, Fourth Kornmeier Decl. ¶¶ 6-7.

"The Court's authority is limited to the release of non-exempt agency records in

existence at the time the agency receives the FOIA request." *Anderson v. U.S. Dep't of Justice*,

518 F. Supp. 2d 1, 10 (D.D.C. 2007); *see also Rothschild v. Dep't of Energy*, 6 F. Supp. 2d 38,

40 (D.D.C. 1998) (concluding that plaintiff who identified two responsive documents which may

have been in the agency's possession but were not released merely "demonstrates that the

government's search was not perfect," however "[p]erfection . . . is not the standard").  Even if

the EOUSA once had the unredacted tapes in its possession, it is not now obligated to create

them, *see, e.g., Schoenmann v. Fed. Bureau of Investigation*, 573 F. Supp. 2d 119, 140 (D.D.C.

2008), or to retrieve them, *see Wilbur v. Cent. Intelligence Agency*, 355 F.3d 675, 678 (D.C. Cir.

2004) ("[T]he fact that responsive documents once existed does not mean that they remain in the

CIA's custody today or that the CIA had a duty under FOIA to retain the records."); *SafeCard*

*Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) ("If the agency is no

longer in possession of the document, for a reason that is not itself suspect, then the agency is not

improperly withholding that document . . . .").

The EOUSA demonstrates that it fulfilled its obligations under the FOIA.  The EOUSA's

search for records responsive to plaintiff's FOIA request has been deemed adequate and

reasonable under the circumstances, Order, *Callaway v. U.S. Dep't of the Treasury*, No. 08-5480

(D.C. Cir. June 2, 2009), and the only tapes located were those the USAO/MDFL received from

Customs, *see* Def.'s 3d Renewed MSJ, Fourth Kornmeier Decl. ¶ 5.  The EOUSA "released to

[plaintiff] exactly what he requested," Reply, Fifth Kornmeier Decl. ¶ 8, namely, copies of the recordings in the EOUSA's possession without further redaction. Nothing in the record establishes that the EOUSA is "withholding the original versions of audio tapes N-113 & N-116," or that the EOUSA has failed to conduct a search for the tapes, or that the EOUSA's failure to produce them constitutes "an illegal withholding under the FOIA." Pl.'s Opp'n at 5.

### B. Customs' Search for Responsive Records

The D.C. Circuit found that Customs "should not have limited its search to [plaintiff's] criminal investigative files, when his request appears to encompass additional material, which may not be located in a criminal investigative file." Cir. Mem. at 1. Further, Customs' supporting affidavits "do not support the conclusion that [its] search was reasonably calculated to locate all responsive records stored in microfiche." *Id.* Customs' submissions do not indicate "that the [Investigations Records System] database includes all microfiche files, or whether there are separate search mechanisms for paper and microfiche files." *Id.* at 3. It is useful at this point to review plaintiff's FOIA request and Customs' response.

### 1. Plaintiff's April 1, 2004 FOIA Request[8]

On April 1, 2004, plaintiff requested from Customs the following information:

> 1.     Entire investigation Files, for Case No.: TA13CR95TA0040, and 95-290-CR-T-21(E).
> 2.     Audio tapes N-113, N-114, N-115, & N-116, Non composite nor redacted.
> 3.     U.S. Customs contact logs, to all audio tapes N-1-N-116.
> 4.     U.S. Customs chain of custody logs to all audio tapes N-1-N-116, and all video tapes.

---

[8]     Plaintiff's April 1, 2004 request essentially reopened a request that Customs closed administratively in December 1998. *See* Defs.' MSJ, First Fields Decl. ¶¶ 7, 15-17.

> 5.      *All audio tapes service invoices from Ron Rose productions for the editing, redacting, and copying of the audio tapes; as well as the video tapes.*[9]
> 6.      All Operations Manual [sic] concerning the handling of audio & video tapes.
> 7.      Names of the audio custodians responsible for the storage and record keeping of the above mentioned audio and video tapes as well as the custodian records.

Defs.' MSJ, First Fields Decl., Ex. G (Letter from plaintiff to Customs dated April 1, 2004) at 4 (emphasis added).  The request was referred to Customs' Washington, D.C. headquarters, *id.*, First Fields Decl. ¶ 16, and headquarters in turn directed that the Miami office process it, *id.*, First Fields Decl., Ex. H (Letter to plaintiff from Gloria L. Marshall, Chief, Information Disclosure Unit, Mission Support Division, Customs, dated June 2, 2004).

### 2.  TECS and IRS Systems of Records

It is Customs' practice "to have an Analyst access the Treasury Enforcement Communication System (TECS) to search for and locate any records relating to the subject of an individual's request for records."  Defs.' MSJ, First Fields Decl. ¶ 22.  "TECS is an electronic system of records that contains a variety of types of law enforcement information . . . includ[ing] information about individuals, such as name, alias, date of birth, address, physical description, various identification numbers (e.g., seizure numbers), as well as certain details about law enforcement investigations."  Defs.' Renewed MSJ, Third Fields Decl. ¶ 8.  Federal, state and local law enforcement sources provide information maintained in TECS.  *Id.*

---

[9]      It appears that Ron Rose Productions is a Tampa, Florida company hired by Customs or the USAO/MDFL to service the 116 audio tapes generated during the investigation of plaintiff and others.  *See* Pl.'s Aff. [Dkt. #93] at 7.  Plaintiff asserts that the company may have copied the tapes for distribution or altered them from their original state.  *Id.*

TECS is a centralized system in that information stored in it "is accessible from designated computer terminals" and it "links cases and records." *Id.*, Third Fields Decl. ¶ 8. A search for information in TECS about a particular individual, then, "reveals not only files directly related to the subject (e.g., the investigation of the subject), but also will 'link' to other records associated with the named subject and the records associated with the subject's records (such as the records of co-conspirators)." *Id.*, Third Fields Decl. ¶ 8. "[A] computerized search using TECS . . . can determine whether any case files have been opened or closed on a particular subject, individual or entity (business, organization or thing)." *Id.*, Third Fields Decl. ¶ 10. "If a file has been opened on the subject of a request, that file would be located in an [Investigations Records System]." *Id.*, Third Fields Decl. ¶ 10.

Customs interprets the term "'criminal investigative files' to mean 'investigative files' that were part of the Privacy Act system of records known as the *Investigations Records System* (IRS)." Defs.' 3d Renewed MSJ, Pavlik-Keenan Decl. ¶ 5 (emphasis in original). IRS records are "maintained in both hardcopy files and on microfiche," and are "organized and retrieved by investigative case number." Defs.' Renewed MSJ, Third Fields Decl. ¶ 9. Each field office "maintains the portion of the IRS that pertains to investigations initiated by that . . . office" because IRS "is not a centralized system" of records. *Id.*, Third Fields Decl. ¶ 9. An "[i]nvestigation[] initiated by a particular . . . field office would include the initial investigation," that is, "an investigation . . . precipitated by a specific event or information," and the collateral investigation "precipitated as a result of an initial investigation and . . conducted by . . . [a]gents in another . . . field office." *Id.*, Third Fields Decl. ¶ 9. For example, the Tampa field office

would maintain in its IRS initial investigations it initiated, as well as collateral investigations conducted by other field offices at its behest.  *Id.*, Third Fields Decl. ¶ 9.

Customs "uses TECS to locate records within the IRS."  *Id.*, Third Fields Decl. ¶ 10.  If a file has been opened on a subject, the file would be located in an IRS.  *Id*., Third Fields Decl. ¶ 10.  The TECS search also "indicate[s] whether the IRS files are maintained locally, in the field, or archived in the National Records Center," in order that the files "can . . . be physically retrieved from the appropriate location."  *Id.*, Third Fields Decl. ¶ 10.  "Thus, although the physical records that constitute the IRS are maintained in different [Customs] offices, [Customs] uses TECS to determine which . . . offices maintain records in the IRS pertaining to the subject of the search."  *Id*., Third Fields Decl. ¶ 10.

Customs conducted multiple searches of TECS using plaintiff's name and date of birth as search terms.  *See* Defs.' MSJ, First Fields Decl. ¶¶ 21-22; Defs.' Renewed MSJ, Third Fields Decl. ¶¶ 12, 14, 17, 20-21.  Its "many searches of TECS . . . reveal[ed] records linked with the plaintiff, and these records were reviewed as part of the review process to determine if they were responsive."  Defs.' Renewed MSJ, Third Fields Decl. ¶ 8.  Responsive records were located in TECS and in the Tampa and Miami field offices' IRS records.  *Id.*, Third Fields Decl. ¶¶ 12, 17.  Among those searches was a December 2004 "search of the IRS [at the Miami field office] . . . in an effort to locate the investigative files, contact logs, audio and video tapes requested in plaintiff's [April 1, 2004] request."  *Id.*, Third Fields Decl. ¶ 22.  "The Miami analyst obtained the investigative file associated with plaintiff and conducted a thorough physical examination of the file."  *Id.*, Third Fields Decl. ¶ 22.  This manual search yielded "[n]o audio or videotapes . . .

[and no] service invoices . . . from Ron Rose Productions for editing, redacting or copying audiotapes." *Id.*, Third Fields Decl. ¶ 22.

In addition, Customs searched "other records typically not maintained in an investigative file," specifically, the Special Agent Handbook, which "is maintained by the [Office of Investigations] Policy Unit or on an internal website known as the '[Office of Investigations] Proprietary Website.'" Defs.' 3d Renewed MSJ, Pavlik-Keenan Decl. ¶ 10; *see* Reply, First Supp. Pavlik-Keenan Decl. ¶ 6.

### 3. Customs' Response to Plaintiff's April 1, 2004 FOIA Request

Customs reported its search results to plaintiff as follows:

> Item 1. "Entire investigative files, for case no. TA13CRTA0040, and 95-290-CR-T-21(e)." We have located 159 pages of records responsive to your request. Forty-three pages of records are being released to you with deletions made pursuant to exemptions (b)(2), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F) of the FOIA. We have withheld 116 pages of records in their entirety pursuant to exemptions (b)(2), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F) of the FOIA.
>
> Item 2. "Audio tapes N-113, N-114, N-115, & N-116, non composite nor redacted". The United States Attorney assigned to your case has control of any audiotapes responsive to your request. That office will review any responsive tapes and make a determination of disclosure, after consultation with this office, and respond directly to you.[10]

---

[10]    Customs' declarant stated that "specific audiotapes, contact sheets, chain of custody records, tape service records, or 'contact logs' . . . would normally be found in . . . field files." Defs.' Reply, Second Fields Decl. ¶ 6. Audiotapes "were originally located in the Tampa field office," and according to the case agent assigned to plaintiff's case, "the audiotapes along with the contact logs were turned over to the United States Attorney[] . . . for trial and were not returned." *Id.*, Second Fields Decl. ¶ 6. The declarant further stated that "[r]esponsive audiotapes located in the Miami field office were turned over to the United States Attorney Office . . . for the Middle District of Florida during the prosecution," and were not returned after the conclusion of the criminal case. Defs.' MSJ, First Fields Decl. ¶ 23. Manual searches of the

(continued...)

Item 3. "U.S. Customs contact logs, to all audio tapes N-1-N-116". No records response.  To date, this office has been unable to locate any such logs.  It is the contention of this agency that these logs do not exist.

Item 4. "All U.S. Customs chain of custody logs to all audio tapes N-1-N-116, and all video tapes."  No records response.

Item 5. "All audio tapes service invoices from Ron Rose productions for the editing, redacting, and copying of the audio tapes; as well as the video tapes".  No records response.  No such invoices exist.

Item 6: "All Operations Manual concerning the handling of audio & video tapes."  While this office does not maintain any Operation Manual specifically concerning the "handling of audio and videotapes," responsive records were found in another manual. However, these records are exempt from disclosure pursuant to exemptions  (b)(2), (b)(7)(E) and (b)(7)(F) of the FOIA.

Item 7: "Names of the audio custodians responsible for the storage and record keeping of the above mentioned audio and video tapes as well as the custodian records."  Your request is denied pursuant to exemptions (b)(7)(C) and (b)(7)(F) of the FOIA.  No records were found regarding "custodian records" and this subject would presumably be included in our response to Items 3 and 4 of your request.

Defs.' MSJ, First Fields Decl., Ex. I (Letter to plaintiff from Gloria G. Marshall, Chief,

Information Disclosure Unit, Mission Support Division, Customs, dated April 13, 2005) at 1-2.

### 4.  Plaintiff's Challenge to Customs' Search

Plaintiff's initial challenges to Customs' search pertain principally to its failure to locate

all the records he requested.  *See, e.g.,* Compl. at 12-13; Pl.'s Opp'n at 8.  In determining the

---

[10](...continued)
investigative files maintained by the Tampa and Miami field offices located no audiotapes. *See* Defs.' Reply, Second Fields Decl. ¶¶ 6-7; Defs.' Renewed MSJ, Third Fields Decl. ¶¶ 21-22. Based on its supporting declarations, Customs apparently maintained no audiotapes at the time it received plaintiff's FOIA request.

adequacy of an agency's search, however, "the  issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983) (citing *Perry v. Block*, 684 F.2d 121, 128 (D.C. Cir. 1982)); *see Hornbostel v. U.S. Dep't of the Interior*, 305 F. Supp. 2d 21, 28 (D.D.C. 2003) (stating that "[t]he focus of the adequacy inquiry is not on the results" of the search).  Plaintiff cannot prevail solely on the basis of Customs' inability to locate all of the records he requested.

In response to defendants' third renewed motion for summary judgment, plaintiff focuses on the agency's failure to locate "some records from the RON ROSE PRODUCTIONS company for the editing and copying services provided," Pl.'s Opp'n at 8 (emphasis in original), as well as records of other expenditures related to the investigation, such as payments to confidential informants, *see id*. at 8-10, 31-33.  Based on Customs' own description of TECS and IRS, and in light of the breadth and scope of Customs' investigation of plaintiff and others, Pl.'s Opp'n at 8-9, plaintiff asserts that "records from the EVIDENCE CUSTODIAN and/or FINANCIAL/ACCOUNTING departments should have surfaced," *id.* at 31 (emphasis in original).  In his view, Customs' "no records" response not only "insults the intelligence of the plaintiff and this court," but also "show[s] that [Customs'] search . . . was not reasonably calculated to uncover all relevant documents."  *Id.* at 33.[11]

It is apparent from plaintiff's FOIA requests that he seeks information pertaining to his criminal investigation, and for this reason Customs properly conducted searches of TECS and

---

[11]     Plaintiff cannot now expand the scope of his original FOIA request for invoices from Ron Rose Productions for the editing or copying of the requested audio tapes by demanding information pertaining to other investigation-related expenditures.

13

IRS, the databases most likely to contain information of this nature.  However, plaintiff's FOIA request "is reasonably susceptible to a broader reading," *LaCedra v. Exec. Office for U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003), than one encompassing only investigatory or criminal investigatory records.  His request for invoices for services rendered by Ron Rose Productions, for example, does not so clearly or exclusively pertain to law enforcement that TECS and IRS could be the only systems of records likely to contain responsive records. According to Customs, information pertaining to investigation-driven expenditures is not maintained in TECS, Reply, First Supp. Pavlik-Keenan Decl. ¶ 8, and the agency does not "as a matter of practice, interpret FOIA requests for investigatory files as requests for records of underlying expenditures related to those investigations."  *Id.*, First Supp. Pavlik-Keenan Decl. ¶ 7.  Absent some explanation as to whether or where Customs might maintain information such as the invoices plaintiff requests, or whether such information would or would not be among the types of information maintained either in IRS or TECS, the Court cannot determine whether Customs has fulfilled its obligations under the FOIA.  For this reason, defendants' third renewed motion for summary judgment will be denied in part.

## 5.  Records Stored on Microfiche

Customs previously explained that IRS records are "maintained in both hardcopy files and on microfiche."  Defs.' Renewed MSJ, Third Fields Decl. ¶ 9.  In light of the D.C. Circuit's ruling, Customs has submitted a declaration explaining that the agency "examined its systems of records again and determined that it cannot locate any IRS microfiche records responsive to plaintiff's request."  *Id.*, Pavlik-Keenan Decl. ¶ 11.

After an examination of its systems of records, Customs determined that it "no longer maintains IRS records on microfiche and has not done so for many years." *Id.*, Pavlik-Keenan Decl. ¶ 11.  "TECS was replaced by an updated system (called 'TECS II') on October 1, 1987," at which time Customs' "use of microfiche was discontinued." *Id.*, Pavlik-Keenan Decl. ¶ 11. Any microfiche records then in existence "were stored in boxes from 1987 until 1996, when they were . . . destroyed." *Id.*, Pavlik-Keenan Decl. ¶ 11.  Because "[p]laintiff's investigation was conducted during the mid-1990's, Customs would not have used microfiche to store records compiled during that investigation." *Id.*, Pavlik-Keenan Decl. ¶ 11.  The agency's "original search, as well as supplemental searches recently conducted in TECS in response to plaintiff's FOIA request, would have captured any IRS files responsive to plaintiff's request and a search of microfiche would not have been possible." *Id.*, Pavlik-Keenan Decl. ¶ 11.

Plaintiff challenges Customs' assertion "that the microfiche files are now non-existence [sic], and have been out of use now since October 1, 1987," because a prior declarant averred "that microfiche files [were] one of the storage mediums [sic] used by [Customs]." Pl.'s Opp'n at 11.  He argues that the more recent declaration, *see* Defs.' Renewed MSJ, Pavlik-Keenan Decl. ¶ 11, makes a "bald assertion . . . with no documented . . . proof," Pl.'s Opp'n at 11, such as an "agency directive[] or internal memorandum," *id.* at 12, to explain "that the microfiche files have infact [sic] been discontinued." *Id.*

The Pavlik-Keenan declaration is "based on [the declarant's] personal knowledge and experience, review of documents kept in the course of business, and information conveyed to [her] in the course of [her] official duties."  Defs.' 3d Renewed MSJ, Pavlik-Keenan Decl. ¶ 4. Mindful that agency declarations are accorded a presumption of good faith, *see Chambers v. U.S.*

*Dep't of the Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) (noting that substantial weight traditionally is accorded to agency affidavits in FOIA "adequacy of search" cases); *SafeCard Servs.*, 926 F.2d at 1200 (presumption of good faith accorded to agency affidavits cannot be rebutted by "speculative claims about the existence . . . of other documents"), the Court accepts the declarant's representation that she is "fully competent to make the statements contained in [her] declaration," Defs.' 3d Renewed MSJ, Pavlik-Keenan Decl. ¶ 1, and that, in her capacity as Customs' FOIA Officer, she is "familiar with the facts of this case," *id.*, Pavlik-Keenan Decl. ¶ 4. The FOIA does not require that a declarant produce an agency directive or internal memorandum to support a statement made on her personal knowledge. Even if microfiche were a means of storing information at one time, plaintiff points to no authority for the proposition that a particular method of storage must be or is always maintained indefinitely.

Customs demonstrates that responsive records would not have been stored on microfiche and that any microfiche records maintained by the agency would have been destroyed before plaintiff submitted his FOIA request. A search of microfiche records would not be possible under these circumstances, and Customs does not violate the FOIA by failing to conduct a search for IRS records maintained on microfiche.

### C.  Public Domain

Under FOIA Exemption 3, the EOUSA withholds in full information described as "verbatim accounts of testimony of witnesses before the grand jury." Def.'s MSJ, First Kornmeier Decl. ¶ 25. The D.C. Circuit notes that, "[i]n light of Exhibit W to the complaint, which contains the public transcripts of [plaintiff's] criminal trial and sentencing hearing, it appears that [plaintiff] has met his initial burden of pointing to specific information in the public

16

domain that he asserts is the same information requested and withheld under an otherwise valid

exemption. " Cir. Mem. at 2.  The D.C. Circuit directs that the "trial transcripts . . . be compared

to the grand jury transcripts to determine whether any portion of the grand jury transcripts *is*

*identical to* the public transcripts."  *Id.* (emphasis added).

Under the public domain doctrine, information otherwise exempt from disclosure "lose[s]

its] protective cloak once disclosed and preserved in a permanent public record."  *Cottone v.*

*Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999); *see Afshar v. Dep't of State*, 702 F.2d 1125, 1130

(D.C. Cir. 1983) (commenting that "[a] number of courts have shown a willingness to accept the

argument that publicly known information cannot be withheld under [E]xemption[] . . . 3").

Plaintiff identifies two witnesses and specific pages of the trial transcript on which portions of

their testimony appear for the purpose of demonstrating that "the protective cloak of [Exemption

3 has] been ripped away by the public disclosure of these witnesses' trial testimony." Compl. at

15.

Defendant's declarant explains that she "compare[d] portions of the trial testimony as

referred to by [plaintiff] in his complaint[] with grand jury transcripts in his case."  Defs.' 3d

Renewed MSJ, Brown Decl. ¶ 3.  She "carefully read and took notes of the only two grand jury

transcripts in the file – those [containing the testimony] of United States Customs Marine

Enforcement Officer David Lee Edge and United States Customs Special Agent James Taman."

*Id.,* Brown Decl.  ¶ 4.[12]  Next, she "read the portions of the trial transcripts referred to in

---

[12]      Plaintiff asserts that Kenneth Sanders "[t]estified on two occasions during
[p]laintiff's trial as a cooperating witness for the Government," Compl. at 15, and that, because
he "testified to more outs and ins' [sic] related to the prosecution of [p]laintiff releasing much
information publicly," his trial testimony "surely encompassed his Grand Jury testimony," *id.* at

(continued...)

[plaintiff's] original complaint on pages 15, 16, 29 and 30," and listed the dates and pages of the transcripts she reviewed as follows:

> Specifically, pages 174-240 of Special Agent Taman's testimony on March 6, 1996; pages 26-31 of Officer Edge's testimony and pages 168-184 of Special Agent Taman's testimony on March 7, 1996; pages 100-173 of Officer Edge's testimony on March 11, 1996; and pages 2-24 of Officer Edge's testimony on March 12, 1996.

*Id.*, Brown Decl. ¶ 5.  Lastly, the declarant "compared the grand jury transcripts of each witness to his trial testimony and determined there is no identical testimony before the grand jury and at trial from either witness."  *Id.*, Brown Decl. ¶ 6.[13]

Plaintiff acknowledges that the declarant performed the "perfunctory duty" of comparing the grand jury transcripts with portions of the trial transcripts, Pl.'s Opp'n at 6, but he argues in favor of "taking away [the] good faith presumption accorded" to the agency's submission precisely because the duty was forced upon it by the courts.  *Id.*; *see id.* at 28.  He further "avers that the defendants' declared assertion is undermined . . . by its proposition that agents . . . went before a grand jury and presented evidence . . . in support of launching an indictment against the

---

[12](...continued)
16.  Plaintiff contends that Sanders' "sworn statements[] and proffer statements entered the public domain on March 7, 1995 during this trial testimony."  *Id.* at 29; *see id.*, Ex. W. Defendant's declarant, however, states that the USAO/MDFL has "no copy of any grand jury testimony of Kenneth Sanders in [its] files," and that "[n]one of the grand jury material withheld in full under Exemption 3 . . . contained grand jury testimony from Kenneth Sanders."  Defs.' 3d Renewed MSJ, Brown Decl. ¶ 4.

[13]       The Court concurs that it is reasonable under the circumstances for the defendant to "compare the grand jury transcript to the specific portions of the trial transcripts identified by plaintiff as containing grand jury material and to release . . . identical portions," if any.  Defs.' 3d Renewed MSJ at 16 n.5.  Otherwise, the EOUSA would be forced to compare the 19 pages of grand jury testimony it located with hundreds of pages of trial transcripts submitted with the complaint.

plaintiff and others, and that . . . evidence is separate and exclusive of the evidence presented at

the very trial that the grand jury proceedings created." *Id*.; *see id.* at 29.  Lastly, plaintiff asserts

that the declarant fails "to describe the type of review performed . . ., whether it was contextual,

verbatim, or disjointed e.t.c. [sic]," opining that "a legal document is not just simply read, it has

to be analyzed, not to say by a linguistic expert, but the manner in making such a comparison

does require some skills that calls for a description of the process." *Id.*; *see id.* at 29.  And,

because "the contents of grand jury testimonies" become "scattered all over trial testimonies,"

plaintiff "requests that this court . . . appoint a neutral party to conduct the comparison of the sets

of transcripts, and/or conduct In Camera Inspection itself due[] to plaintiff's inability to confirm

or refute the defendants' bald assertion." *Id.* at 7; *see id.* at 30.

Plaintiff meets his initial burden by "pointing to specific information in the public

domain that appears to duplicate that being withheld." *Afshar*, 702 F.2d at 1130.  However, he

cannot prevail simply by demonstrating that the same witnesses testified both before the grand

jury and at trial and by providing the trial transcripts.  "Prior disclosure of similar information

does not suffice; instead, the specific information sought by the plaintiff must already be in the

public domain." *Wolfe v. Cent. Intelligence Agency*, 473 F.3d 370, 378 (D.C. Cir. 2007)

(citation omitted).  Plaintiff's speculation as to the content of the grand jury testimony does not

establish that the witnesses' testimony has entered the public domain during the trial.  *See*

*Whalen v. U.S. Marine Corps*, 407 F. Supp. 2d 54, 59 (D.D.C. 2008) (noting that a requester's

"educated guess" as to contents of a withheld report does not constitute a waiver of a FOIA

exemption).

Customs' declaration is accorded a presumption of good faith, and the declarant avers that the relevant portions of the transcripts are not identical to any portion of the grand jury transcripts.  Plaintiff fails, then, to show that the requested information has entered the public domain.  *See Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 60 (D.C. Cir. 2003) (concluding that, even if certain of the requested information in a multi-volume compendium pertaining to Cuban nationals had been released, the requester failed to "show that [the released] information duplicates the contents of the [c]ompendium"); *Am. Civil Liberties Union v. Dep't of Defense*, 664 F. Supp. 2d 72, 77 (D.D.C. 2009) (finding that the government's release of a declassified memorandum and report does not demonstrate that the requested information is in the public domain where the "redacted information . . . is specific and particular to each detainee and would reveal far more about the CIA's interrogation process than the previously released records"), *aff'd*, 628 F.3d 612 (D.C. Cir. 2011); *North v. U.S. Dep't of Justice*, 658 F. Supp. 2d 163, 173 (D.D.C. 2009) ("Although [the requester] has produced excerpts from transcripts of his trial to show that the documents he is seeking may actually exist, he has not shown that these documents were entered into evidence at trial or otherwise formally enshrined in a permanent public record."); *Bullock v. Fed. Bureau of Investigation*, 577 F. Supp. 2d 75, 79 (D.D.C. 2008) (finding that transcript reflecting that certain exhibits were merely discussed during trial does not bring the exhibits into the public domain); *Peay v. Dep't of Justice*, No. 04-1859, 2007 WL 788871, at *4 (D.D.C. Mar. 14, 2007) (concluding that plaintiff's production of "a portion of his criminal trial transcript showing that an audiotape was played at the trial and a newspaper article describing an audiotape played at the trial as recorded conversations between undercover agents and one of plaintiff's co-defendants" was "too vague"

to support his public domain theory that "this trial evidence is the same information that was

presented to the grand jury").  And the Court is not obligated to conduct its own comparison of

the transcripts in order to substantiate plaintiff's assertions.  *See Nat'l Sec. Archive Fund v. Cent.*

*Intelligence Agency*, 402 F. Supp. 2d 211, 221-22 (D.D.C. 2005) (rejecting requester's

suggestion that the "Court . . . make a side-by-side comparison of the key judgments of [withheld

report] with statements by White House, National Security Council, Department of State and

Department of Defense officials, on the theory that the comparison "would likely demonstrate

that much of the information . . . has already been publicly aired by the government in officially

authorized testimony, speeches, publications and the like").

## III.   CONCLUSION

There remains no factual dispute as to the content of the audio tapes released by the

EOUSA, and the EOUSA released these tapes to plaintiff without redacting them further.  In

addition, the EOUSA demonstrates that the grand jury testimony identified by plaintiff has not

entered the public domain through identical testimony presented by the same witnesses at

plaintiff's criminal trial, and, therefore, the grand jury material has not lost its Exemption 3

protection.  Customs demonstrates that no records responsive to plaintiff's FOIA request would

have been maintained on microfiche, making it impossible for staff to have searched IRS

microfiche records for information responsive to plaintiff's FOIA requests.  In these respects,

Defendants' Third Renewed Motion for Summary Judgment will be granted in part.

Customs' search for other records in response to plaintiff's FOIA request appears to have

been improperly limited to investigatory records, and, accordingly, the Court will deny

defendants' motion in part without prejudice.  Defendants may file a renewed motion for

summary judgment based on additional undisputed facts or by providing additional legal

arguments.  A separate Order accompanies this Memorandum Opinion.

Signed this 15th  day of November, 2011.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge